**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1) LINDA GRAY, as the | ) | |
| Special Administrator of the Estate | ) | |
| of JUSTIN BARRIENTOS, Deceased, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-23-1023-D |
| | ) | |
| (1) THE GEO GROUP, INC., | ) | JURY TRIAL DEMANDED |
| (2) MICHAEL BOGER, D.O., | ) | |
| in his individual capacity, | ) | |
| (3) KRISTINE KUSNER, R.N., | ) | ATTORNEY'S LIEN CLAIMED |
| in her individual capacity, | ) | |
| (4) KALISA BLANCHARD, | ) | |
| in her individual capacity, | ) | |
| (5) KENNETH SMITH, | ) | |
| in his individual capacity, | ) | |
| (6) MICHAEL MURPHY, M.D., | ) | |
| (7) EXPRESS MOBILE DIAGNOSTIC | ) | |
| SERVICES, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Linda Gray, as the Special Administrator of the Estate of Justin Barrientos, deceased, by and through her attorneys, Paul DeMuro and Danny C. Williams, Sr. of FREDERIC DORWART, LAWYERS PLLC and Guy A. Fortney, Corbin Brewster and Katie McDaniel, of BREWSTER & DE ANGELIS, PLLC, and for her claims against the Defendants, alleges and states as follows:

### I.   INTRODUCTORY STATEMENT

1. This civil rights action is brought under 42 U.S.C. § 1983 to address the actions of all Defendants who were deliberately indifferent to the serious medical and mental health needs of the decedent, Justin Barrientos ("Barrientos"). Defendants' deliberate indifference caused Barrientos prolonged pain, suffering, and untimely death while in custody at the Lawton

Correctional and Rehabilitation Facility ("LCRF"), a private prison operated by Defendant The GEO Group, Inc. ("GEO"). Barrientos was 31 years old at the time of his death.

2.     Justin Barrientos ("Barrientos") died on January 31, 2023, from acute peritonitis from a bowel perforation while at LCRF. He suffered excruciating pain for several days while begging for essential medical treatment from the Defendants. His pleas for help were met with indifference and dismissal by GEO's correctional and medical staff.  After his death, GEO's correctional officers falsified prison logs to cover up their neglect of duty in failing to provide meaningful observation of Justin Barrientos on January 31, 2023, while his mental and physical health precipitously declined.

3.     GEO's medical doctor, Michael Boger, knowing that Barrientos had swallowed a "spork,"[1] refused to physically examine or even speak to Barrientos on January 31, 2023, even after Boger observed x-rays that showed "free air" in Barrientos' abdomen. "Free air" in the abdomen was an obvious red flag of acute abdominal trauma, including a gastrointestinal perforation, which created an imminent risk of death that should have resulted in immediate emergency transport to an outside emergency medical facility. Dr. Boger, motivated in part by his disdain for, or discomfort with, inmates like Barrientos, who suffered severe mental illness, deliberately decided not to transport Barrientos to an off-site emergency medical facility despite being aware of the grave risk of death associated with gastrointestinal perforation.

4.     Nurse Kristine Kusner, a GEO employee who was on duty on January 31, 2023, failed to perform basic nursing functions that would have readily diagnosed Barrientos' deteriorating, life-threatening condition. Nurse Kusner was also aware that Barrientos had

---

[1] A spork is plastic cutlery taking the form of a spoon-like scoop with two to four fork-like tines. https://en.wikipedia.org/wiki/Spork

swallowed a spork earlier that afternoon and that he was experiencing extreme abdominal pain. Still, she failed to examine or treat Barrientos or refer him to a higher level of care.

5.     Instead of receiving basic and necessary medical and mental healthcare, Barrientos was placed alone in a prison cell, where he slowly and painfully died. A CCTV video feed captured his agonizing death. Although Barrientos was placed in an isolation cell on suicide watch that required constant monitoring by GEO's staff, the cell was left unattended for prolonged periods while Barrientos suffered a slow and agonizing death from the infection to his peritoneal cavity. By the time GEO staff finally entered Barrientos' cell the night of January 31, 2022, he had been lying face down, dead on the cell floor motionless for over 90 minutes, his body "cold and stiff" in a state of rigor mortise, with a yellow-tinted puddle of bile next to his face. The prolonged delay of prison staff to find and treat Barrientos was shockingly indifferent, given that a CCTV video feed provided continuous monitoring of his status within the cell and he was on a "Suicide Watch Level I," which required continuous line-of-sight monitoring.  Either nobody at GEO cared enough to monitor Barrientos, or GEO's prison staff watched his agonizing death slowly unfold while doing nothing to intervene.

6.     As explained in more detail below, GEO and its correctional and medical staff were deliberately indifferent to Barrientos' obvious and known serious medical and mental health needs in violation of the Eighth Amendment to the United States Constitution. *See Smith v. Allbaugh*, 987 F.3d 905, 910 (10th Cir. 2021).  Because GEO and its employees and agents operate a prison under a contract with the Department of Corrections for the State of Oklahoma and, therefore, perform penal functions traditionally within the state's exclusive power and responsibility, Defendants acted under color of state law with respect to all matters alleged in this Complaint.

## II.   **PARTIES, JURISDICTION AND VENUE**

7.      **Plaintiff Linda Gray** is Justin Barrientos' natural mother and the duly appointed Special Administrator of the Estate of Justin Barrientos. At the time of the events set forth herein, Justin Barrientos was an inmate in the custody of The GEO Group, being held at the Lawton Correctional and Rehabilitation Facility ("LCRF"), a private prison operated by The GEO Group, Inc., located in Lawton, Oklahoma.

8.      **Defendant The GEO Group, Inc**. ("GEO") is a for-profit Florida corporation headquartered in Boca Raton, Florida. GEO owns and operates LCRF under a contract or contracts with the Department of Corrections for the State of Oklahoma ("OKDOC"). The OKDOC pays GEO an estimated $40-50 million annually to operate LCRF. GEO's common stock is publicly traded on the New York Stock Exchange (NYSE: GEO). According to a recent Form 10-K filed with the Securities and Exchange Commission, GEO recorded revenue in excess of $2.37 billion in 2022. GEO was responsible for ensuring the safety and well-being of inmates detained and housed at LCRF, including providing appropriate medical and mental care and treatment to inmates needing such care, pursuant to 57 Okla. Stat. §§ 47, 561. In addition, GEO was responsible for creating, implementing, and maintaining policies, practices, and protocols that govern the provision of medical and mental health care to inmates at the LCRF, including acting as a "gatekeeper" for medical resources available to treat the medical needs of inmates in GEO's custody and housed at LCRF. GEO is further responsible for the training and supervising of its employees and agents when it results in an unconstitutional act by the employee. The actions of GEO, in this case, evidence a deliberate indifference to serious medical needs and gross deficiencies in staffing, facilities, equipment, policies, or procedures that caused inmates in its

custody, including Barrientos, to be effectively denied access to adequate medical and mental health care.

9.      **Defendant Dr. Michael Boger** ("Dr. Boger") is a Doctor of Osteopathic Medicine and was at all times relevant hereto an employee of GEO. Dr. Boger was responsible for overseeing Barrientos' health and well-being and assuring that his medical and mental health needs were met, including acting as a "gatekeeper" for off-site emergency medical resources available to treat Barrientos during the time he was in GEO's custody and housed at the LCRF.  At all times pertinent, Dr. Boger acted under the color of state law, performing traditional correctional functions. Dr. Boger is sued in his individual capacity.

10.     **Defendant Kristine Kusner, R.N.** ("Nurse Kusner") is a Registered Nurse and was at all times relevant hereto an employee of Defendant GEO. Nurse Kusner was responsible for overseeing Barrientos' health and well-being and assuring that his medical and mental health needs were met, including acting as a "gatekeeper" for medical resources available to treat Barrientos during the time he was in GEO's custody and housed at the LCRF. On January 31, 2023, she was the "charge nurse" on LCFR's medical unit. As a charge nurse, she had a duty to oversee nursing operations in the GEO medical unit. At all times pertinent, Nurse Kusner acted under the color of state law, performing traditional correctional functions. Nurse Kusner is sued in her individual capacity.

11.     **Defendant Kalisa Blanchard** ("Blanchard"), at all times relevant to this Complaint, was a private correctional officer employed by GEO with the rank of Sergeant. Blanchard was responsible for monitoring inmate security and safety and alerting medical staff to serious medical needs, including acting as a "gatekeeper" for medical resources available to treat Barrientos while he was in the custody of GEO Group and housed at the LCRF. At all times

pertinent, Blanchard acted under the color of state law, performing traditional correctional functions.  Blanchard is sued in her individual capacity.

12.     **Defendant Kenneth Smith** ("Smith"), at all times relevant to this Complaint, was a private correctional officer employed by Defendant GEO, with the rank of "Correctional Officer." Smith was responsible for continuous monitoring of Barrientos while he was on suicide watch and alerting medical staff to serious medical needs, including acting as a "gatekeeper" for medical resources available to treat Barrientos during the time he was in GEO's custody housed at the LCRF. At all times pertinent, Smith acted under the color of state law. Smith is sued in his individual capacity.

13.     **Defendant Dr. Michael Murphy ("Dr. Murphy")** is a Medical Doctor and was, at all times relevant hereto, employed by, or an agent of, Defendant Express Mobile Diagnostics. Dr. Murphy was responsible for reviewing and providing sound medical opinions on the radiological imaging of Barrientos taken by Express Mobile on January 31, 2023. He further held himself out as capable and qualified to evaluate, diagnose, and perform radiological interpretations of x-ray films and images required to treat life-threatening conditions, including but not limited to radiologic signs of gastrointestinal perforation, including "free air." Upon information and belief, Dr. Murphy resides in Oklahoma.

14.     **Defendant Express Mobile Diagnostic Services, LLC** ("Express Mobile") was contracted by GEO to provide x-ray diagnostic services, including reviewing, consulting, and providing opinions on submitted x-rays of inmates in GEO's custody. Express Mobile represents itself to the public as being competently and adequately staffed to provide evaluation, diagnosis, and radiological interpretation of x-ray films and images required to treat life-threatening

conditions, including but not limited to radiologic signs of gastrointestinal perforation, including "free air." Defendant Express Mobile is principally based in Pennsylvania.

15.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection and redress deprivations of rights secured by the Eighth Amendment and Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color state of law.

16.     This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367 since the claims form part of the same case and controversy arising under the United States Constitution and federal law.

17.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Barrientos's' claims occurred in this District.

### III.     FACTUAL ALLEGATIONS

#### a.     Background

18.     From May 24, 2018, until his death on January 31, 2023, Justin Barrientos served a prison sentence for criminal convictions in Oklahoma. At the time of his death, Barrientos was 31 years old and was incarcerated at LCRF and in the custody of GEO.

19.     GEO owns and operates LCRF under contracts with the OKDOC in which GEO assumes the obligation to house and care for offenders at LCRF.

20.     OKDOC pays an estimated $40 million annually to GEO to house its prisoners at LCRF.

21.     LCRF is a 2,626 bed adult male medium and maximum security correctional facility.

22.     GEO's correctional and medical staff, including the Defendants, knew of and were deliberately indifferent to Barrientos' suffering, failing to monitor and treat his serious medical, physical, and mental health conditions. Prior to and throughout his internment at LCRF, Barrientos had a well-known, documented history of severe mental illness. Barrientos was previously incarcerated in the custody of OKDOC in 2015. OKDOC screened, diagnosed, and provided psychiatric treatment to Barrientos.

23.     In 2017, Barrientos was found incompetent in Pottawatomie County Case No. CF-2016-893. Records from the publicly available competency proceedings reflect that Barrientos was diagnosed with schizoaffective disorder (Bipolar type), Post-traumatic stress disorder (PTSD), and Amphetamine Use Disorder (Severe).

24.     As a result of his legal incompetency in 2017, Barrientos was admitted to the Oklahoma Forensic Center for treatment by the Oklahoma Department of Mental Health and Substance Abuse Services for in-patient psychiatric care. Barrientos was prescribed psychotropic medication, including Seroquel, Haldol Decanoate, Cogentin, Depakote, Effexor IR, and Prazosin.

25.     Upon reception of Barrientos by OKDOC at the Lexington Assessment and Reception Center (LARC) in 2018, pursuant to 57 O.S. § 530.1, ODOC administered certain physical and psychological examinations as well as a risk and needs assessment of Barrientos, which were provided to GEO for use, consideration, and evaluation of his mental and medical health needs.

26.     Once Barrientos was transferred to LCRF in 2018, GEO was required to perform an additional mental health screening by qualified mental health professionals to determine Barrientos' individual mental health needs, including but not limited to his risk of suicide, psychotropic medications, and specific housing needs. Further, GEO was responsible for providing

medical and mental health services to Barrientos while he was housed at LCRF as required by the United States Constitution, Oklahoma Constitution, and by contractual agreements with the State of Oklahoma.

27.     Records of Barrientos' substantial psychiatric history, particularly from his previous incarceration as well as his admission and treatment at the Oklahoma Forensic Center in 2018, were readily available and known by GEO and the on-site medical providers, including but not limited to Dr. Boger, Nurse Kusner, and GEO's health services and correctional staff.

28.     From Barrientos' court records, OKDOC screening, and GEO's screening upon his transfer to LCRF, GEO and all Defendants had actual knowledge of Barrientos' significant medical and mental health diagnoses, behavior, risks, and needs, including Barrientos' psychiatric diagnoses and obvious risk of suicide.

29.     All Defendants and other GEO agents failed to provide adequate psychiatric care to Barrientos, including necessary psychiatric evaluation, monitoring, and medication management consistent with Barrientos' diagnosed mental illness. Without proper psychiatric care from GEO, Barrientos' mental health declined during his incarceration at LCRF.  GEO also failed to act as a prudent "gatekeeper" for Barrientos' mental health needs by failing, in the weeks before his death, to transfer him to an OKDOC facility with specialized mental health treatment capabilities not available at LCRF.

30.     The pattern and practice at LCRF by GEO and its agents, including the Defendants, are the result of GEO's policy and practice to avoid the associated costs of basic and/or advanced medical and psychiatric care, including transportation for emergency medical care outside the prison,  through delay and/or denial of such care.

**b.   January 27-30, 2023 – Barrientos swallows a spork, experiencing extreme abdominal pain**

31.     On January 27, 2023, Barrientos was seen in the medical unit at LCRF, complaining of chest and stomach pain from swallowing a spork. X-rays were taken of Barrientos, but he was not sent to the hospital by GEO medical staff.

32.     Barrientos was housed in Unit 9 at LCRF, a segregated housing unit, in a double-occupied cell. Rather than providing any medical treatment for possible soft tissue perforation in his abdomen due to the swallowed spork, Barrientos was sent back to his cell. He remained in his cell and continued to experience and complain of extreme pain, both untreated and unmonitored by the LCRF medical staff, including the individual defendants herein.

33.     In the days after January 27, Barrientos was physically ill. According to Barrientos' cellmate, Barrientos was coughing, throwing up bile-like substances, feverish, complaining of abdominal pain, and periodically passing out or having seizures. Barrientos repeatedly complained of stomach pain to medical staff. Barrientos was so violently ill and disturbed his cellmate claimed he was suicidal so that he would be removed from the cell and away from Barrientos.

34.     On January 30, 2023, Barrientos complained of stomach pain to nurses again. Despite his complaints and obvious physical illness, per GEO's policies and practices, he was told he would not be evaluated or treated unless he submitted a written sick call slip.

35.     Barrientos called his brother on January 30, 2023, to complain of severe abdominal pain and the lack of medical attention from GEO. Barrientos reported to his family that he had been sick for several days and thought he had been throwing up feces out of his mouth.

36.     During this time, Barrientos' family repeatedly informed GEO employees at LCRF of Barrientos' declining mental and physical health and requested that he be transferred out of Unit 9 and to a different facility that was better equipped to treat Barrientos' severe mental illness.  GEO

10

failed to transfer Barrientos to an available specialized mental health facility at OKDOC, which would have prevented his death.

     **c.**  **<u>January 31, 2023 –Barrientos Declining Health and Ultimate Death</u>**

37.     On January 31, 2023, Nurses Kaitlyn Jones and Amber Lopez, GEO employees, went to speak with Barrientos' cellmate in Unit 9.

38.     While talking with the cellmate, Nurse Jones observed Barrientos start coughing and drinking from a cup. Nurse Jones believed Barrientos had swallowed a spork.

39.     Nurse Lopez saw Barrientos put a spork in his mouth. The correctional officer called medical staff to report that Barrientos swallowed the spork. Barrientos was escorted to the medical unit at LCRF.

40.     Dr. Boger was the GEO doctor overseeing medical care at LCRF on January 31 when Barrientos arrived at the medical unit. Upon becoming aware Barrientos likely swallowed a spork and was vomiting, Dr. Boger ordered an x-ray.

41.     Sharp objects, like "sporks," once ingested, can cause tears, holes, and ruptures of the gastrointestinal tract, including the small bowels.

42.     Around noon on January 31, Joe Wiley, an x-ray technician working for Defendant Express Medical, which had contracted with GEO to provide x-ray scanning services at LCRF, took an x-ray of Barrientos and provided it to Dr. Boger.

43.     **Wiley and Dr. Boger observed "free air" on Barrientos' x-ray under his stomach and diaphragm, an obvious sign of a probable gastrointestinal perforation or a "hole" in Barrientos' gastrointestinal tract.**

44.     **The presence of "free air" on the X-ray was objectively obvious; it was so obvious that Wiley, a non-physician, detected it immediately. Wiley immediately pointed out**

to Dr. Boger the areas of concern on the x-ray and told Dr. Boger that Barrientos' condition was "serious."

45.     Gastrointestinal perforation is a serious emergency medical condition that creates an imminent risk of death or severe injury and requires immediate emergency medical care to repair the perforation and address any contamination of the abdominal cavity. An untreated gastrointestinal perforation causes internal bleeding and significant blood loss, peritonitis (inflammation and infection of the inner abdominal wall lining), permanent damage to the GI tract, and sepsis, a life-threatening reaction to an infection. These serious health risks associated with gastrointestinal perforation were well-known to Dr. Boger and Nurse Kusner.

46.     After reviewing the x-ray, Wiley expressed concern to Dr. Boger that Barrientos had a perforation and required emergency treatment. **Dr. Boger responded: "Oh my God, that's kind of serious, right?"**

47.     Dr. Boger knew, at that time, that (i) someone with a gastrointestinal perforation "would be [in] extreme pain, which implies that the bowels are open" and (ii) that somebody with "free air" in the abdominal cavity needed immediate emergency medical care because of the serious risk of death or significant injury caused by a gastrointestinal perforation.

48.     As the on-duty physician, Dr. Boger had the authority to order the immediate transport of Barrientos to off-site emergency medical facilities, including nearby emergency rooms.

49.     Despite his knowledge of a serious medical condition and imminent risk of death or serious injury, Dr. Boger did not, on January 31, perform a physical examination of Barrientos or direct any healthcare provider to examine him. Neither Dr. Boger nor Nurse Kusner recorded Barrientos's vital signs nor ordered labs. At most, Dr. Boger merely looked briefly at Barrientos

through a slot or window in the cell or room in which Barrientos was being held.  Dr. Boger failed to provide any treatment at all to Barrientos. Neither Dr. Boger nor Nurse Kusner palpated or physically examined Barrientos in any way, a rudimentary and quick diagnostic test for acute internal abdominal trauma, even though Barrientos had swallowed a spork, had obvious signs of a gastrointestinal perforation on his x-ray, and was complaining of severe abdominal pain. Dr. Boger did not ask Barrientos a single question to help diagnose Barrientos' condition.

50.     After Barrientos' death, Dr. Boger claimed that he decided not to perform any examination or clinical assessment on Barrientos because he came to the clinic that day for "mental health" reasons. Given that Dr. Boger knew that Barrientos had likely swallowed a spork, was complaining of severe abdominal pain, and the x-ray showed obvious signs of gastrointestinal perforation, Dr. Boger's refusal to provide even the most basic medical examination of Barrientos because of his mental health status constituted a callous and shocking disregard for Barrientos' serious and obvious medical needs.

51.     While in the medical unit on January 31, 2023, Barrientos continued to suffer. He declined food due to intense stomach pain. Barrientos had been complaining of intense pain in his abdomen for several days to several GEO employees leading up to his placement in the medical unit on January 31, 2023, and throughout that day.

52.     In addition to complaining of stomach pain, Barrientos appeared physically weakened and unsteady on his feet, falling several times in the medical unit on January 31.

53.     GEO Correctional Officer Savion Carter described Barrientos as experiencing "excruciating" pain before his death and "moaning, groaning, and complaining of stomach pain." Carter also reported Barrientos could not eat because of the pain. Carter told the ODOC OIG investigator that "when the nurses would come into the exam room, Barrientos complained about

13

stomach pain, but the nurses disregarded it and made comments about not swallowing sporks." Carter described the pain as excruciating but reported that: "**The nurses acted like they didn't care about Barrientos.**  **One of those nurses was Nurse Kusner**.

54.     GEO Correctional Officer Angel Rodriguez described Barrientos as shaking as he removed his clothes before his x-ray. As Barrientos exited the exam room after the x-rays, he was "shaking worse." Rodriguez attempted to get the attention of GEO nursing staff, but they motioned to escort him back to a cell rather than for additional medical examination.

55.     GEO Correctional Officer Jennifer Mott spoke with Barrientos while he was in the examination room on January 31. Barrientos reported stomach pain. Mott described Barrientos lying in the fetal position. At the end of her shift, Mott again spoke to Barrientos, who was still lying in the fetal position and complaining of stomach pain.

56.     GEO Medical Staff Ginette Nganga, an Advanced Practice Nurse Practitioner, noted that Barrientos complained of chest and stomach pain. Nganga examined Barrientos on both January 27 and January 31.  Nganga's medical notes were available to Dr. Boger.

57.     Dr. Boger decided not to transport Barrientos to an outside emergency medical facility for appropriate, emergent, and necessary medical care despite observing the serious medical condition of "free air" in his abdomen, which was clearly displayed on the x-ray.  Dr. Boger callously believed that Barrientos, because of a history of severe mental health issues, was faking or exaggerating his symptoms.  Rather than provide direct medical care to an obvious and serious medical need, Dr. Boger let Barrientos slowly and painfully succumb to the perforation in an isolation cell. Dr. Boger left LCRF around 6:20 p.m. on January 31, 2023, but remained the "on-call" medical provider.

58.     Dr. Boger had not received nor reviewed the radiologist's report from Express Mobile of Barrientos' x-ray before he left the prison on January 31, 2023. However, the day after Barrientos's death, Dr. Boger admitted to another GEO employee that he had seen "free air" in Barrientos' abdominal x-ray. Dr. Boger claimed he didn't provide any treatment because Barrientos didn't "appear" to be in pain or display any other symptoms. Of course, Dr. Boger took no steps to clinically assess Barrientos' symptoms, failing to perform even a cursory physical examination or to ask Barrientos a single question. Had Dr. Boger performed a cursory physical examination on Barrientos and transported him to an off-site emergency medical facility, Barrientos would have survived.

59.     Barrientos' condition was objectively dire, pointing to one blindingly obvious course of action – immediate transport to an off-site emergency medical facility.  Had Dr. Boger or Nurse Kusner ordered the transport, Barrientos would still be alive.

60.     After Barrientos' death, the OKDOC's Office of Inspector General ("OIG") conducted an administrative and criminal investigation into his death. The OIG correctly found there was "cause to believe" that Dr. Boger violated OKDOC policies in that he: (i) failed to protect and provide safe and humane medical care for Barrientos; (ii) failed to devote his full-time attention and effort to his duties during his assigned hours of duty; (iii) engaged in conduct that did not afford respect and courtesy for the dignity of Barrientos, and with regard for the welfare of Barrientos; and (iv) failed to carry out assigned duties and devote full time, attention, and efforts, to ensure the safety and well-being, of the Barrientos. **Critically, the OIG investigator also found, correctly, that Dr. Boger's policy violations were "contributing factors" in the decline of Barrientos' health and his resulting death "while he was in the care and custody of the GEO staff, at the LCRF."**

61.     Barrientos was never physically examined by a doctor, physician's assistant, nurse practitioner, or person otherwise adequately trained to make threshold decisions regarding the care or evaluation of inmates with emergent medical injuries, including decisions about whether the inmate should be transferred to an outside medical facility for a higher level of care

62.     On the evening of January 31, Nurse Kusner was assigned to the medical unit as the charge nurse. As a charge nurse, she had a duty to oversee the operations of the GEO nursing unit, including the care and treatment of inmates in the medical unit like Justin Barrientos. As a charge nurse, Nurse Kusner had the authority to recommend and arrange transport of inmates to outside medical facilities, including nearby emergency rooms. The GEO correctional staff reported Barrientos' physical decline to Nurse Kusner.

63.     While in the medical unit on January 31, Nurse Kusner never took any vital signs, examined Barrientos, or conducted any nursing assessments to evaluate his medical condition or whether he should be transferred to an emergency level of care. When Barrientos' deteriorating condition was brought to her attention by GEO correctional staff, rather than perform her duty as a nurse, she responded, **"That's just Barrientos. That's what he does. He's okay." A few hours later, Barrientos died in isolation and agony. Nurse Kusner's minimization and dismissal of Barrientos' symptoms because of his mental health status constituted a callous and shocking disregard for Barrientos' serious and obvious medical needs.**

64.     Throughout the evening of January 31 before his death, Barrientos displayed classic symptoms of a perforated bowel: severe abdominal pain and cramping, bloating, fever, nausea and vomiting, and fatigue.

65.     GEO staff placed Barrientos in an isolation cell on a "Suicide Watch Level I" status. Per GEO policies, Level I status required "one-on-one visual, line of sight monitoring with observations of behavior logged a minimum of every 15 minutes" on a "Suicide Watch Log."

66.     The CCTV camera in the suicide watch cell in which Barrientos was being detained captured him stumbling several times, falling off the metal bunk and striking his head, and generally making movements consistent with someone with extreme abdominal pain and in an obviously declining state of physical health. Despite a duty to continually monitor and provide medical care, no one entered his cell to provide treatment as he was dying. The last movement by Barrientos seen on CCTV was at 9:14 p.m., a small twitching movement in his right leg. At 10:55 p.m., he is found to be nonresponsive, and a medical emergency is called. At 11:17 p.m., he was pronounced dead by a third-party emergency medical technician.

67.     When GEO staff finally responded at 10:55 p.m., they found Barrientos dead, lying face down in a puddle of bile, his body cold and stiff, in rigor mortise. By that time, Barrientos had likely been dead for more than 90 minutes.

68.     Nurse Kusner's deliberate indifference was so apparent to fellow nursing staff that several GEO nurses reported Nurse Kusner to the Oklahoma Board of Nursing for her callous conduct related to Barrientos' death, specifically for refusing to examine or even to check on Barrientos for several hours while he was slowly and painfully dying of acute peritonitis. Had Nurse Kusner timely evaluated Barrientos, he would have survived.

69.     The OKDOC OIG's investigation of Barrientos' death correctly found that Nurse Kusner, like Dr. Boger, (i) failed to protect and provide safe and humane medical care for Barrientos; (ii) failed to devote her full time, attention, and effort to her duties during his assigned hours of duty; (iii) engaged in conduct that did not afford respect and courtesy for the dignity of

Barrientos, and with regard for the welfare Barrientos; and (iv) failed to carry out assigned duties, and devote full time, attention, and efforts, to ensure the safety and well-being, of Barrientos. **Critically, the OIG investigator also found, correctly, that Kusner's policy violations were "contributing factors" in the decline of Barrientos' health and his resulting death "while he was in the care and custody of the GEO staff at the LCRF."**

70.     On January 31, 2021, during the 11 hours when Barrientos was first placed on suicide watch until the time GEO medical and correctional staff found him unresponsive in his cell, all Defendants were aware of the following:

    a.  Barrientos had swallowed one or more sporks between January 27-January 31, 2023;

    b.  Barrientos was demonstrating extreme abdominal pain by moaning, groaning, refusing food, and repeatedly telling staff that he was in pain;

    c.  Barrientos was growing weaker and weaker. He suffered numerous falls, appeared pale and weak, and eventually fell off his bunk in the medical unit, where he lay motionless for hours; and

    d.  Barrientos had "free air" in his body, consistent with a perforation of his stomach or colon as seen on x-rays reviewed by Dr. Boger.

    e.  That "free air" in the abdominal cavity is an obvious sign of a serious risk of death or serious harm that requires immediate emergency medical treatment.

71.     All Defendants knew that Barrientos' medical condition was serious and potentially deadly.

72.     Defendants disregarded the obviousness of Barrientos' serious medical condition as evidenced by the "free air" on the x-ray and knew, or should have known, that a gastrointestinal perforation mandated immediate and emergent treatment.

73.     Defendants GEO, Dr. Boger, and Nurse Kusner knew or should have known of the substantial risk of serious harm to Barrientos that would occur if he was not transferred immediately to a hospital for timely surgical intervention to treat the probable gastrointestinal perforation. If those Defendants had transported Barrientos to an outside hospital, his life could and would have been saved.

74.     Defendants GEO, Dr. Boger, and Nurse Kusner refused to treat Barrientos for his injuries and knew, or should have known, that failing to send him out for further evaluation by qualified medical personnel would cause unnecessary pain and a worsening of his condition.

75.     Ignoring obvious signs and symptoms of gastrointestinal perforation, Defendants GEO, Dr. Boger, and Nurse Kusner disregarded an excessive risk to Barrientos' health and safety, which they knew of and was their duty, obligation, and responsibility to address.

76.     On January 31, 2023, Defendant Smith was assigned to suicide watch duty. Smith was responsible for providing continuous line-of-sight monitoring of Barrientos when he was in the isolation cell on "Suicide Watch Level I."  Upon information and belief, Smith left Barrientos' cell unattended for prolonged periods while Barrientos suffered a slow and agonizing death from the infection to his peritoneal cavity.  Smith either failed to monitor Barrientos continuously, or he watched Barrientos in obvious distress and need of emergency medical care as his agonizing death slowly unfolded while doing nothing to intervene or help.

77.     After Barrientos' death, Smith falsified the "Suicide Watch Log" to make it appear, falsely, that Smith had continuously monitored Barrientos.  **For example, Smith falsely recorded**

**on the log that Barrientos was "awake" and "quiet" when Barrientos lay motionless and dead on the cell floor for more than 90 minutes**.

78.     On January 31, 2023, Blanchard was posted to a security station on the medical unit and responsible for monitoring inmate security, including performing periodic "stand up" identification checks. Before taking her post, Blanchard received a briefing about Barrientos' medical and mental health status and that he had been put on Suicide Watch Level I.  Blanchard failed to see, or intentionally ignored, that Barrientos was in obvious extreme medical distress and need of immediate medical care. After Barrientos died, Blanchard falsified her security monitoring logs to make it falsely appear that Blanchard was continually monitoring Barrientos when, in fact, Blanchard intentionally left her post or otherwise failed to monitor Barrientos for prolonged periods. **For example, Blanchard falsified her security log to indicate that Barrientos was standing up for a security check during the 10:00 p.m. hour when, in fact, Barrientos was at that time lying face down, motionless, and likely dead.**

79.     The OKDOC OIG investigator correctly found that Blanchard and Smith (i) failed to protect and provide safe and humane medical care for Barrientos; (ii) failed to devote their full time, attention, and effort to his duties during their assigned hours of duty; (iii) engaged in conduct that did not afford respect and courtesy for the dignity of Barrientos and with regard for the welfare of Barrientos; (iv) failed to promptly and truthfully report any improper actions which endanger others;  (v) failed to carry out assigned duties, and devote full time, attention, and efforts, to ensure the safety and well-being of Barrientos; and (vi) willfully misrepresented documentation of the work they performed. **Critically, the OIG investigator also found, correctly, that Blanchard's and Smith's policy violations were "contributing factors" in the decline of Barrientos' health and his resulting death "while he was in the care and custody of the GEO staff, at the LCRF**."

80.     After Barrientos' death, LCRF Health Services Administrator Emily Timm, a GEO employee, called Barrientos' sister to advise the family of his death. Timm lied to the family about the cause of Barriento's death, claiming the death was due to "natural causes." Timm refused to provide additional information to the family.

81.     An autopsy performed by Oklahoma's Office of Chief Medical Examiner found that Barrientos' cause of death was acute peritonitis from an ingested foreign body (a spork) that perforated his ileum. The Medical Examiner described "[a] four-tines, white plastic fork (13 cm long x 3 cm wide)" lodged into Barrientos' terminal ileum with tines toward the ileocecal valve. The handle perforated the ileum and protruded into Barrientos' peritoneal cavity. A second identical spork was loose in Barrientos' stomach. Barrientos had a red abrasion on his forehead.

**d.   GEO's Policies, Practices, and History of Deliberate Indifference**

82.     GEO was at all times hereto responsible for providing medical and mental health services, treatment, and medication to Barrientos while he was in custody at LCRF. GEO was additionally responsible for creating and implementing policies, practices, and protocols that govern the provision of medical and mental health care to inmates at LCRF.

83.     Defendants' deliberate indifference to Barrientos' serious medical needs was in furtherance of and consistent with: (a) policies, customs, and practices which GEO promulgated, created, implemented, or possessed responsibility for the continued operation of; and (b) policies, customs, and practices which GEO had responsibility for implementing and which GEO assisted in developing.

84.     Longstanding, systemic deficiencies exist in the medical and mental health care provided to inmates at LCRF. GEO has long known these systemic deficiencies and the substantial

risks they pose to inmates like Barrientos but has failed to take reasonable steps to alleviate those deficiencies and risks.

85.     Contrary to its constitutional and contractual responsibilities, GEO's policy, custom, and practice was to refuse to refer inmates to outside medical care and delay necessary treatment to inmates because GEO was not always reimbursed for the costs associated with transporting prisoners to off-site medical care. GEO knows inmates whose medical needs require health-related services unavailable at LCRF must have treatment and/or hospitalization made through an outside community provider. GEO delayed or refused to transport inmates to medical providers outside of LCRF, even in medical emergencies like Barrientos, where it was obvious the prisoners' medical conditions far exceeded the capabilities of staff and facilities available at LCRF. GEO had a policy, custom, and practice of refusing to transfer inmates outside the prison for a higher level of medical care to save expenses and thereby boost its profits. This policy, practice, and custom originated at the highest corporate level of GEO, including the Medical Director at LCRF and GEO's Utilization Management.

86.     GEO failed to conduct meaningful pre-employment credentialing and periodic credentialing reviews on each licensed healthcare practitioner providing healthcare services to inmates. GEO knew failing to properly credential its healthcare provider posed a specific risk to the health and safety of inmates needing care like Barrientos. GEO knew or should have known, that Dr. Boger was incompetent to provide constitutionally adequate care to inmates. In 2016, a 28-year-old patient died of a perforated ulcer after Dr. Boger failed to diagnose his emergent condition. In 2017, Dr. Boger failed to diagnose a patient with an emergent medical need, leading to the patient suffering a perforation of his appendix and peritonitis. Dr. Boger lost privileges as

an emergency room physician and was subsequently hired by GEO. His OBNDD license is inactive, meaning he cannot prescribe controlled medications.

87.     In December 2021, Dr. Boger was deliberately indifferent to the serious medical needs of another inmate, Alford Bradley. Dr Boger denied Bradley treatment for his umbilical hernia by noting in the medical record that Bradley appeared not to be in pain. Despite the inmate's excruciating pain and dire medical condition, Dr. Boger refused to send Bradley to surgery. Bradley died at LCRF.

88.     Upon information and belief, GEO has implemented numerous policies, customs, and practices at LCRF, which result in inmate suffering, denial of medical care, and death. Additionally, written GEO policies that relate to mental health and medical care were regularly ignored. These policies, customs, and practices at LCRF include, but are not limited to:

   a.  Withholding necessary medication, services, and care from inmates to cut costs and increase profits for GEO;

   b.  Chronic inadequate staffing, insufficient to ensure minimum levels of observation and monitoring of inmates;

   c.  Even though GEO's written policy may have required constant visual supervision of inmates on level one suicide watch, assigned corrections officers were often distracted and even sleeping at their posts. On at least one occasion, another inmate successfully committed suicide while on level one suicide watch but wasn't discovered until the next shift. GEO routinely tolerated this behavior by GEO correctional officers; it amounted to an accepted and widespread custom and practice.

d.  When day shift correctional officers attempted to do a "pass on" – the exchange of information with the previous shift employees at shift change – with night shift officers, they were sometimes told, "We took turns off and on sleep."

e.  There was a general lack of empathy and callous mistreatment by GEO employees toward inmates with mental illness, which included mocking them and referring to them by demeaning nicknames. Barrientos, for example, was nicknamed "Poocasso" because he drew on the walls of a suicide watch cell with his feces.

f.  There was a pervasive attitude of indifference by GEO mental health staff toward inmates. Rather than provide necessary mental health care, GEO staff often dismiss problems by saying, "That's just what he does."

g.  While GEO had a policy of daily mental health rounds, the personnel who were responsible for these rounds would often sign off without actually checking on inmates.

h.  Night-shift correctional officers, including supervisors, would regularly ignore the policy of completing a "standing count" by marking it completed without actually performing the "standing count." GEO routinely tolerated this behavior by GEO correctional officers; it amounted to an accepted and widespread custom and practice.

i.  GEO medical staff regularly failed to respond to requests for medical care for days and sometimes a week or more.

j.  GEO physicians, including Dr. Boger, regularly failed to physically examine patients.

89.     In 2008, a riot at a GEO-run detention facility was triggered by the death of an inmate due to inadequate medical care by GEO. GEO's deliberate indifference to the inmate's medical needs resulted in his death.[2]

90.     GEO has long been aware that its corporate policies result in inadequate medical care for serious medical conditions. GEO has failed to provide adequate medical care for the serious medical needs of inmates at LCRF for years.

91.     Prior to Barrientos' death, GEO knew or should have known that Defendants Express Mobile and Dr. Murphy were providing opinions and consultation on x-rays, which were often inaccurate or substandard. After Barrientos' death, Express Mobile's Operating Manager advised the OIG investigator that GEO staff knew Express Mobile had a history of misreading X-rays.

92.     ODOC notified GEO in 2018 that GEO was not adhering to medication and nursing protocols at LCRF. ODOC fined GEO. At that time, Joe Allbaugh, ODOC Director, said, "**Private prisons (e.g., GEO) do not run their facilities to our standards, but they are supposed to adhere to our operational protocols…The only way you can get their attention is financial sanctions**."[3]

93.     Director Allbaugh's message is that GEO, the private prison he referred to, makes decisions primarily based on financial costs. GEO and its employees delay and refuse medical care to inmates suffering from serious medical conditions because of costs and financial decision-making rather than medical needs, including the costs associated with transporting inmates off-site

---

[2] https://www.prisonlegalnews.org/news/2010/feb/15/denial-of-medical-care-causes-two-riots-at-GEO-group-texas-prison/

[3] https://thecrimereport.org/2018/07/09/geo-group-gets-ok-raise-despite-violations/

for emergency medical care. These practices manifested in GEO's mistreatment of Barrientos, described herein, and were contributing causes to his death.

94.     Each of these instances above provided Defendant GEO with clear prior notice of the deficiencies and indifference of its medical staff, including the individual defendants herein, and that they failed to provide appropriate and necessary medical care to inmates.

95.     Each of these instances above provided Defendant GEO notice that it has failed to have a protocol or clear policy with respect to the medical monitoring and care of inmates with complex or serious medical needs and provides no guidance to its medical staff regarding the appropriate standards of care for inmates with severe injuries, including spinal cord injuries.

96.     Each of these instances above provided Defendant GEO notice that it has failed to have a protocol or clear policy with respect to the medical monitoring and care of inmates with complex or serious medical needs as "gatekeepers" who must be prepared to provide access to medical personnel capable of evaluating and treating complex or serious medical conditions including but not limited to gastrointestinal perforation.

97.     Each of these instances above provided Defendant GEO notice that it has failed to supervise, monitor, and train its medical staff, including the individual defendants herein, with respect to the medical monitoring and care of inmates with complex or serious medical needs, and appropriate standards of care for inmates with severe injuries including gastrointestinal perforation.

98.     Each of these instances  above provided Defendant GEO notice that it has failed to supervise, monitor, and train its medical staff, including the individual defendants herein, with respect to medical monitoring and care of inmates with complex or serious medical needs as "gatekeepers" who must be prepared to provide access to medical personnel capable of evaluating

and treating complex or serious medical conditions including but not limited to gastrointestinal perforation.

99.     GEO LCRF Health Services Administrator Emily Timm claimed, in an interview with the OKDOC OIG, that none of GEO's employees responsible for Barrientos' care violated GEO policies. In other words, according to Timm, GEO employees acted according to GEO's customary training, supervision, practice, and policies when they failed to (i) physically examine or palpate Barrientos, even after being advised of several incidents of trauma that Barrientos suffered on January 31, 2023; (ii) record Barrientos' vital signs or order lab testing; or (iii) transport Barrientos to a hospital during his medical emergency despite knowledge of his gastrointestinal perforation.

### CLAIMS FOR RELIEF[4]

### Count 1
### Deprivation of Federal Civil Rights
### 42 U.S.C. § 1983 – *Monel Liability*
### THE GEO GROUP, INC.

100.     Defendant GEO is a "person" for purposes of 42 U.S.C. § 1983.

101.     Defendant GEO, as the owner and operator of a private prison, acted under color of state law, is charged with implementing policies with respect to the medical and mental health care of inmates at the LCRF and has a responsibility to adequately hire, train, and supervise its employees, including the individual defendants herein to assure that GEO provides constitutionally adequate medical and mental health services.

102.     The Eighth Amendment's cruel and unusual punishment clause  "imposes a duty on prison officials to provide humane conditions of confinement, including adequate food,

---

[4] The allegations contained in every paragraph of this Complaint are incorporated into each of the separate claims for relief.

clothing, shelter, sanitation, medical care, and reasonable safety from serious bodily harm." *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008).  The deliberate indifference to an inmate's serious medical needs by a private prison or its employees violates the Eighth Amendment.

103.    Defendant GEO violated its constitutional duty to provide Barrientos adequate medical and mental health care by adopting and maintaining policies, procedures, or customs of practice that caused violations of Barrientos' constitutional right to adequate medical and mental health services and care and were enacted or maintained with deliberate indifference to the almost certain civil rights violations that would occur thereby.

104.    Defendant GEO, as the medical contractor at the LCRF, is the official policymaker for medical care at the facility.

105.    Defendant GEO implements, maintains, and imposes its corporate policies, practices, protocols, and customs at the LCRF.

106.    Defendant GEO failed to properly supervise, monitor, and train its correctional and medical staff and had unconstitutional widespread policies, practices, patterns, and customs with respect to:

>    a.    Failures to administer medically necessary medication to inmates;
>
>    b.    Failure to hire, supervise, and train medical competent medical staff;
>
>    c.    Noncompliance with required state medical and prison standards regarding procedures for care for acute and emergencies, including protocols for assessment of inmates;
>
>    d.    Reliance on low-level providers and hiring and retention of poor quality and inadequately trained staff, who make threshold decisions regarding care or evaluation of inmates with emergent medical injuries;

e.     Underutilization of diagnostic techniques and technologies;

f.     Refusal to provide treatment and adequate monitoring to inmates who demonstrate obvious signs or symptoms of a serious medical need and instead placing them in "observation" for signs of malingering or "faking;" and,

g.     Failure to fulfill the "gatekeeper role" in refusing to timely transfer inmates with serious injuries for necessary evaluation and treatment by qualified medical personnel, often motivated by practice or custom to save the expenses of off-site transport and thereby boost GEO's profits.

107.    The acts and omissions of Defendant GEO by policy, pattern, or practice are causally related to the injuries complained of herein and rise to the level of a constitutional violation under a municipal liability theory.

108.    There is an affirmative causal link between the deliberate indifference to Barrientos's serious medical needs, his safety, the violations of his civil rights, and the customs, policies, and practices carried out by Defendant GEO.

109.    Defendant GEO knew or should have known, due to its obviousness, that its policies, practices, and customs posed substantial risks to the health and safety of inmates, including Barrientos.

110.    Defendant GEO failed to take reasonable steps to alleviate those risks due to deliberate indifference to inmates, including Barrientos.

111.    Defendant GEO tacitly encouraged, ratified, and approved of the unconstitutional acts and omissions alleged herein.

112.     As a result of the conduct of Defendant GEO, as described above, the decedent suffered damages in the form of mental, physical, and emotional pain and eventual death in violation of his rights under the Eighth Amendment and the violation of provisions of the Civil Rights Act of 1871, 42 U.S.C. § 1983 and is entitled to actual and compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000.00) with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee along with all other such relief as is deemed just and equitable.

113.     Further, the conduct of Defendant GEO was willful, wanton, malicious, shocking to the conscience, exhibiting the required deliberate indifference, and intended to induce lawlessness, terrorize, and cause harm to Barrientos and therefore warrants the imposition of exemplary damages against Defendant GEO.

**Count 2**
**Deprivation of Civil Rights, 42 U.S.C. § 1983**
**Defendants Dr. Boger and Nurse Kusner**

114.     Dr. Boger and Nurse Kusner acted under the color of state law.

115.     When viewed in its totality and compared with accepted professional standards and societal norms, as described in this Complaint, the conduct of Dr. Boger and Nurse Kusner can only be characterized as exhibiting deliberate indifference to Barrientos' constitutional rights, intending to cause harm and deprive him of the civil liberties granted under Eight Amendment to the Federal Constitution. The actions of Dr. Boger and Nurse Kusner were willful, arbitrary, and shocking to the conscience of civilized society. Barrientos suffered grievous mental, physical, and emotional pain and eventual death resulting from the deliberate denial of medical care in the face of an obviously serious medical need.

116.     The acts and omissions of Dr. Boger and Nurse Kusner, as outlined above, include, but are not limited to, the following:

a.     Defendants Dr. Boger and Nurse Kusner disregarded the obviousness of Barrientos' serious medical condition. They knew, or should have known, that finding of "free air" on the x-ray indicated a perforation when they learned that Barrientos had swallowed a "spork and that this mandated immediate and emergent treatment.

b.     Defendants Dr. Boger and Nurse Kusner knew or should have known that emergent treatment of a gastrointestinal perforation can relieve unnecessary pain and prevent death or serious injury caused by any delay in diagnosis and treatment.

c.     Defendants Dr. Boger and Nurse Kusner knew or should have known of the substantial imminent risk of serious harm to Barrientos that would occur if he was not transferred immediately to a hospital for timely surgical intervention to the gastrointestinal perforation.

d.     Defendants Dr. Boger and Nurse Kusner knew, or should have known, that failing to send Barrientos out for further evaluation by qualified medical personnel would cause unnecessary pain and a worsening of his condition and possibly death.

e.     Defendants Dr. Boger and Nurse Kusner knew or should have known that, given all surrounding circumstances, their failure on January 31, 2023, to perform a basic clinical examination of Barrientos or simple palpation and

their failure to record vital signs deprived them of diagnostic data that, if properly used, could have saved Barrientos' life.

f.   By intentionally denying and delaying medical treatment to Barrientos, as described herein, Defendants Dr. Boger and Nurse Kusner failed to take reasonable measures to abate and treat Barrientos's obvious gastrointestinal perforation, causing unnecessary pain, worsening Barrientos's condition and, ultimately, his death.

g.   Defendants Dr. Boger and Nurse Kusner also failed as "gatekeepers" by failing to refer Barrientos to a higher level of care at an off-site facility and, thereby, denying him access to medical treatment personnel capable of evaluating and treating gastrointestinal perforation. Had Defendants Dr. Boger and Nurse Kusner referred Barrientos to an off-site emergency medical facility, Barrientos would have survived.

117.   Nurse Kusner and Dr. Boger failed to even examine Barrientos or to take his vitals, even though other GEO staff had reported to her that Barrientos, while in the isolation cell, had fallen off his bunk and hit his head. Nurse Kusner and Dr. Boger did not care enough to provide the most basic medical assessment or care, dismissing his symptoms and complaints because of his mental health status. Had they checked Barrientos' vitals, they likely would have detected clear signals that Barrientos was in severe distress and needed to be immediately transported to an emergency medical facility.

118.   As a result of the conduct of Defendants Dr. Boger and Nurse Kusner, as described above, Barrientos suffered damages in the form of mental, physical, and emotional pain and eventual death in violation of his rights under the Eighth Amendment and the violation of

provisions of the Civil Rights Act of 1871, 42 U.S.C. § 1983 and is entitled to actual and compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000.00) with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee along with all other such relief as is deemed just and equitable.

119.    Further, the conduct of the Defendants, Dr. Boger and Nurse Kusner, was willful, wanton, malicious, shocking to the conscience, exhibiting the required deliberate indifference and intended to induce lawlessness, terrorize, cause harm to Barrientos and therefore warrants the imposition of exemplary damages against Defendants Dr. Boger and Nurse Kusner.

**Count 3**
**Deprivation of Civil Rights, 42 U.S.C. § 1983**
**Defendants Blanchard and Smith**

120.    Defendants Kalisa Blanchard and Kenneth Smith acted under the color of state law.

121.    When viewed in its totality and compared with reasonably accepted standards of conduct, their conduct must be characterized as exhibiting deliberate indifference to the constitutional rights of Barrientos, intending to cause harm and deprive him of the civil liberties granted under the Eighth Amendment to the Federal Constitution. The actions of Blanchard and Smith were willful, arbitrary, and shocking to the conscience of civilized society. Barrientos has suffered grievous mental, physical, and emotional pain and eventual death resulting from the deliberate denial of medical care.

122.    Their acts and omissions based upon the facts as outlined above include, but are not limited to, the following:

a.    On January 31, 2023, Defendant Blanchard was posted as a security monitor on the medical unit, and Smith was posted on suicide watch outside Barrientos's cell. As such, they had a duty to monitor Barrientos continually

and to perform, or call for, safety and security checks when he was placed in an isolation cell on Suicide Watch Level 1. Defendants Blanchard and Smith knew that Barrientos was reported to have swallowed a spork and was complaining of severe abdominal pain. Despite that knowledge and their duty to continually monitor Barrientos and perform safety and security checks, Defendants Blanchard and Smith deliberately left their posts or otherwise deliberately failed to monitor Barrientos for prolonged periods while he was in obvious distress and in need of immediate medical attention.

b.      Alternatively, Blanchard and Smith observed Barrientos in an obviously dire and life-threatening condition and deliberately failed to take any action to save his life.

c.      Had Defendants Blanchard and Smith performed their duties, continually monitored Barrientos, and called for medical intervention when needed, he could have received life-saving care.

d.      After Barrientos' death, Blanchard and Smith falsified records to make it falsely appear that they had continually monitored Barrientos when, in fact, they had left him unobserved for prolonged periods.

123.    The acts and omissions described above by Defendants Kalisa Blanchard and Kenneth Smith herein violated clearly established statutory and constitutional rights that a reasonable person would have known and were a proximate cause of Barrientos' death.

124.    As a result of the conduct of Defendants Kalisa Blanchard and Kenneth Smith, as described above, the decedent suffered damages in the form of mental, physical, and emotional pain and eventual death in violation of his rights under the Eighth Amendment and the violation

of provisions of the Civil Rights Act of 1871, 42 U.S.C. § 1983 and is entitled to actual and compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000.00) with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee along with all other such relief as is deemed just and equitable.

125.     Further, the conduct of the Defendants Kalisa Blanchard and Kenneth Smith was willful, wanton, malicious, shocking to the conscience, exhibiting the required deliberate indifference, and intended to induce lawlessness, terrorize, and cause harm to Barrientos and therefore warrants the imposition of exemplary damages against Defendants Kalisa Blanchard and Kenneth Smith.

### Count 4
### Negligence
### Express Mobile Diagnostic Services, LLC
### and Michael Murphy, M.D.

126.     At all times relevant, Defendant Murphy was an agent of Express Mobile.

127.     Defendants Express Mobile and Murphy owed a duty to Barrientos to use reasonable care to provide appropriate medical assessment and evaluation.

128.     Defendants Express Mobile and Murphy breached that duty by failing to provide Barrientos with reasonable and adequate medical assessment and evaluation, which would have saved his life.

129.     Defendant Murphy negligently assessed Barrientos' x-rays despite obvious evidence of "free air" on the x-ray. Defendant Murphy inaccurately and negligently assessed the x-ray when he reported, "There is no free air. The bowel gas pattern is unremarkable."

130.     Defendant Express Mobile is vicariously liable for this tortious conduct by its employees, including Defendant Murphy, as it occurred within the scope of employment by Defendant Express Mobile.

131.    As a result of the negligence of Defendants Express Mobile and Murphy, as described above, Barrientos died and Plaintiff is entitled to damages under Oklahoma's Wrongful Death State, 12 O.S. § 1053, et. seq. in the form of medical and burial expenses, economic loss, grief, anxiety, mental pain and anguish, loss of consortium, and the loss of anticipated services suffered by Plaintiff, all in excess of Seventy-Five Thousand Dollars ($75,000.00). Plaintiff further seeks an award of punitive or exemplary damages against the Defendants.

132.    Further, the conduct of Defendants Express Mobile and Murphy was reckless, willful, wanton, and malicious and, therefore, warrants the imposition of exemplary damages against Defendants Express Mobile and Murphy.

### Count 5
### Intentional Infliction of Emotional Distress
### Dr. Boger, Nurse Kusner, Smith, and Blanchard

133.    In acting, or failing to act, in the manner described in this Complaint, Defendants Dr. Boger, Nurse Kusner, Smith, and Blanchard failed to perform their employment duties in good faith and, instead, acted intentionally, recklessly and in bad faith their employment duties.

134.    The conduct described above is extreme and outrageous and caused pain, suffering, severe emotional distress, and the eventual death of Justin Barrientos.

135.    As a result of the intentional and reckless actions of Defendants Dr. Boger, Nurse Kusner, Smith, and Blanchard, which can only be described as extreme and outrageous, Barrientos died. Plaintiff is entitled to damages under Oklahoma's Wrongful Death State, 12 O.S. § 1053, *et. seq.* in the form of medical and burial expenses, economic loss, grief, anxiety, mental pain and anguish, loss of consortium, and the loss of anticipated services suffered by Plaintiff, all in excess of Seventy-Five Thousand Dollars ($75,000.00). Plaintiff further seeks an award of punitive or exemplary damages against the Defendants.

136.    Further, the conduct of Defendants Dr. Boger, Nurse Kusner, Smith, and Blanchard was reckless, willful, wanton, and malicious and, therefore, warrants the imposition of exemplary damages against Defendants Dr. Boger, Nurse Kusner, Smith, and Blanchard.

## PRAYER FOR RELIEF

Plaintiff prays for judgment against the Defendants for actual and compensatory damages, punitive damages, the costs of this action, a reasonable attorney's fee, interest as provided by law, and all other further relief this Court deems just and proper.

Respectfully submitted,


By: */s/ Paul DeMuro*_____
Paul DeMuro, OBA #17605
Danny C. Williams, Sr., OBA #14144
FREDERIC DORWART, LAWYERS PLLC
Old City Hall
124 East Fourth Street
Tulsa, Oklahoma 74103
(918) 583-9922 (telephone)
pdemuro@fdlaw.com

Guy A. Fortney, OBA #17027
Corbin Brewster, OBA #22075
Katie A. McDaniel, OBA #32345
BREWSTER & DE ANGELIS
2617 E. 21st
Tulsa, Oklahoma 74114
(918) 742-2021 (telephone)
gfortney@brewsterlaw.com
kmcdaniel@brewsterlaw.com
ccbrewster@brewsterlaw.com

*Attorneys for Plaintiff, Linda Gray*